Case 1:23-cr-20171-PAS Document 1 Entered on FLSD Docket 04/20/2023 Page 1 of 14

FILED BY\_\_\_\_FS\_\_\_\_D.C.
Apr 20, 2023
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **23-20171-CR-SEITZ/REID**

18 U.S.C. § 371

UNITED STATES OF AMERICA

v.

ANDREW CHORLIAN,

Defendant.
_____/

## INFORMATION

The United States charges that:

### GENERAL ALLEGATIONS

At various times relevant to this Information:

**The Defendant and Relevant Individuals, Entities, and Terms**

1. Defendant **ANDREW CHORLIAN** was a resident of New York, New York.

2. **ANDREW CHORLIAN** was a Blockchain Engineer at Hydrogen Technology from in or around November 2017 through in or around December 2018.

3. MICHAEL KANE was the co-founder and CEO of the Hydrogen Technology Corporation. Hydrogen Technology is a privately-held Delaware corporation currently based in Miami, Florida, and previously based in New, New York. Hydrogen Technology's primary business between October 2018 and April 2019 involved an application programming interface ("API") solution for its clients in the financial industry.

4. SHANE HAMPTON was the Chief of Financial Engineering at Hydrogen Technology from in or around November 2017 through in or around December 2022.

5.  TYLER OSTERN was the President and CEO of Moonwalkers Trading Limited ("Moonwalkers") from in or around July 2018 through in or around January 2020. Moonwalkers was a South African entity that marketed itself as a provider of software-based "market-making" services for crypto assets.

6.  GEORGE WOLVAARDT was the Chief Technology Officer of Moonwalkers.

7.  The "blockchain" was a distributed public ledger that recorded incoming and outgoing crypto transactions.

8.  "Bitcoin" was a type of crypto asset. Bitcoin were generated and controlled through computer software operating via a decentralized, peer-to-peer network. Bitcoin could be used for purchases or exchanged for other crypto assets on exchanges. Bitcoin was commonly known as BTC.

9.  "Ethereum" was a blockchain platform premised on "smart contracts," which were computer programs that automatically executed transactions when certain conditions were met.

10. "ERC-20" was the technical standard for smart contract tokens created on the Ethereum blockchain platform.

11. A "security" included a wide range of investment vehicles, including "investment contracts." Investment contracts were instruments, schemes, or transactions through which a person invested money in a common enterprise and reasonably expected profits or returns derived from the entrepreneurial or managerial efforts of others.

12. A "Wash Trade" was a securities transaction that, among other things, involved no change in beneficial ownership of the security exchanged because the same individual or exchange account was both the seller and buyer in the transaction.

13. A "Spoof Trade" was a securities transaction that, among other things, included a buy or sell order for a security placed without a legitimate intent to execute the order as placed or series of securities transactions creating actual or apparent active trading in a security for the purpose of inducing others to buy or sell such security.

14. In or around February 2018, Hydrogen Technology created, or "minted," 11,111,111,111 ERC-20 tokens ("HYDRO"), which were investment contracts and therefore securities as defined by the Securities and Exchange Act of 1934, 15 U.S.C. § 78c(a)(10).

15. Exchange-1 was a cryptocurrency exchange that was headquartered in Seattle, Washington.

## COUNT 1
### Conspiracy to Commit Wire Fraud and Manipulation of Security Prices
### (18 U.S.C. § 371)

16. Beginning in or around October 2018 and continuing through in or around December 2018, in Miami-Dade County, in the Southern District of Florida, and elsewhere, the defendant,

**ANDREW CHORLIAN,**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, and agree with MICHAEL KANE, SHANE HAMPTON, GEORGE WOLVAARDT, TYLER OSTERN, and others known and unknown to the United States, to commit certain offenses against the United States, that is:

   a. to knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud, and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made, and for the

purpose of executing the scheme and artifice, did knowingly transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, in violation of Title 18, United States Code, Section 1343; and

  b. directly and indirectly, by use of the mails and any means and instrumentality of interstate commerce, and of any facility of any national securities exchange and any member of a national securities exchange, to willfully and for the purpose of creating a false and misleading appearance of active trading in any security other than a government security, and a false and misleading appearance with respect to the market for such security, (A) effect any transaction in such security which involves no change in the beneficial ownership thereof, and (B) enter an order and orders for the purchase of such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been and will be entered by and for the same or different parties, and (C) enter any order and orders for the sale of any such security with the knowledge that an order and orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been and will be entered by and for the same or different parties, in violation of Title 15, United States Code, Section 78i(a)(1); and

  c. directly and indirectly, by use of the mails and any means and instrumentality of interstate commerce, and of any facility of any national securities exchange and any member of a national securities exchange, to willfully effect, alone or with one or more other persons, a series of transactions in any security registered on a

national securities exchange, any security not so registered, and in connection with any security-based swap and security-based swap agreement with respect to such security creating actual and apparent active trading in such security, and raising and depressing the price of such security, for the purpose of inducing the purchase and sale of such security by others, in violation of Title 15, United States Code, Section 78i(a)(2).

**Purpose of the Conspiracy**

17. It was the purpose of the conspiracy for **ANDREW CHORLIAN** and his co-conspirators to unlawfully enrich themselves and Hydrogen Technology by introducing into the market materially false and misleading information about the supply and demand for HYDRO in order to fraudulently induce other market participants to buy and sell HYDRO and artificially inflate the price of HYDRO so that **CHORLIAN** and his co-conspirators could sell HYDRO at artificially inflated prices.

**Manner and Means of the Conspiracy**

The manner and means by which the defendant and his co-conspirators sought to accomplish the purpose and objects of the conspiracy included, among others, the following:

18. GEORGE WOLVAARDT and TYLER OSTERN, through Moonwalkers, were retained by **ANDREW CHORLIAN**, MICHAEL KANE, and SHANE HAMPTON, through Hydrogen Technology, to sell HYDRO on the open market on Exchange-1. MICHAEL KANE maintained with Exchange-1 an account in his name, which the co-conspirators agreed to use, and did use, to sell HYDRO.

19. To do so, GEORGE WOLVAARDT, TYLER OSTERN, and others, designed and implemented a trading strategy software application, or "bot," that placed automated orders on

Exchange-1 in an effort to manipulate the price of HYDRO and sell HYDRO at artificially inflated prices.

20. **ANDREW CHORLIAN** and his co-conspirators agreed to use, and **CHORLIAN** caused GEORGE WOLVAARDT and TYLER OSTERN to use, the bot to place thousands of orders to buy or sell HYDRO on Exchange-1 that **CHORLIAN** and his co-conspirators knew at the time were not placed with a legitimate intent to buy and sell HYDRO but were intended instead to convey false and misleading information to other market participants about the market's supply and demand for HYDRO, deceive other market participants about the same, and fraudulently induce other market participants to buy and sell HYDRO (collectively, "Spoof Orders").

21. **ANDREW CHORLIAN** and his co-conspirators also agreed to use, and **CHORLIAN** caused GEORGE WOLVAARDT and TYLER OSTERN to use, the bot to execute at least 1,700 orders for HYDRO that involved no change in the beneficial ownership of HDYRO because the bot was executing orders with itself as both the buyer and seller of HYDRO in pre-arranged transactions through the Exchange-1 account in the name of MICHAEL KANE ("Wash Trades"). Like the Spoof Orders, **CHORLIAN** and his co-conspirators knew at the time that the Wash Trades were intended to convey false and misleading information to other market participants about the market's supply and demand for HYDRO, deceive market participants about the volume of transactions in HYDRO, and fraudulently induce other market participants to buy and sell HYDRO.

22. **ANDREW CHORLIAN** and his co-conspirators caused GEORGE WOLVAARDT and TYLER OSTERN to execute Spoof Orders and Wash Trades to sell HYDRO at artificially inflated prices.

23. **ANDREW CHORLIAN**, MICHAEL KANE, and SHANE HAMPTON used a private Slack channel to communicate with GEORGE WOLVAARDT and TYLER OSTERN in furtherance of the conspiracy. **CHORLIAN** and his co-conspirators exchanged messages via interstate wires to coordinate the bot's execution of both the Spoof Orders and Wash Trades. OSTERN also routinely updated **CHORLIAN**, KANE, and SHANE HAMPTON via interstate wires about the status of the bot's manipulation of the price of HYDRO on Exchange-1.

24. For example, on or about October 21, 2018, TYLER OSTERN requested a call with MICHAEL KANE to discuss a manipulation strategy he wanted to employ:

| | |
|---|---|
| OSTERN: | Set the bot pretty aggressively now that we've got a little more capital to play with. |
| KANE: | [Exchange-1] volume is getting really low, about $20 Mil in volume per day, we are working to get on some larger ones |
| OSTERN: | Right well [Exchange-2] is actually higher volume.<br>Might push hard there to try and pick up some of that residual volume.<br>Sell side is thin too |
| KANE: | We used to have a lot of volume on [Exchange-2] ... it comes and goes |
| OSTERN: | Hop in a call quick Mike? Have a tactic we've used a few times that works, I'd like to explain a bit<br>Basically we're going to insight [sic] a firesale to shake the weak hands, and get the sell walls to move down a bit so we gain position then push price hard. |
| KANE: | Shane is owning this going forward, perhaps you can chat with him tomorrow morning? he is in the office |
| OSTERN: | Sounds good. let us know what time. |
| KANE: | let me check with him, probably around 11AM EST after all our morning meetings |

HAMPTON: Yeah I'm not around [at the moment] but we can chat tomorrow

25. As another example, on or around October 26, 2018, TYLER OSTERN and MICHAEL KANE engaged in the following exchange regarding the bot's manipulation of HYDRO:

OSTERN: Did a little volume shennanigans [sic] .. we're top 4 on [Exchange-1]

OSTERN: Not sticking much though, everybody is in this for a quick profit. We'll shake the weak hands a bit then push again.

OSTERN: #1 volume on [Exchange-1]

KANE: Yes saw that, lots of volume
It helps to attract other exchanges, we get 1-2 a week now to reach out

OSTERN: Around half is fake, took about 3 seconds for bot to generated about a million.

26. **ANDREW CHORLIAN** and his co-conspirators also discussed how to influence other investors through social media. For example, on or about October 29, 2018, the following exchange took place via interstate wires on the Slack channel:

OSTERN: Try and stress people getting into the trade chat I kind of build trust in the trade chats and guide it up and down. Small detail but we have people putting up some pretty big sell walls we need out of the way if we want the price to go up much.
Otherwise we're stuck around 65-70 sats
Or we can nuke it and hope the walls move down, then recirculate them higher in high volume times. Up to you guys.
[Sorry. option 3, spend a little in transactions fees and pump volume again for some attention.]

HAMPTON: We try to not get involved in any talks involving trading on our telegram or social media
Spending some txn fees is fine

> OSTERN: 10-4
> Can [I] talk pass it on if somebody is speculating in chat?
>
> CHORLIAN: Yeah I don't think there is an issue with anyone else directing people there

27. **ANDREW CHORLIAN** and his co-conspirators also used the Slack channel to coordinate when to cash out profits earned on the sale of HYDRO while still ensuring enough HYDRO and Bitcoin remained in MICHAEL KANE's account on Exchange-1 to facilitate their scheme to manipulate the price of HYDRO. The following exchanges are illustrative:

   a. On or about October 31, 2018:

> OSTERN: @George Can we get a reload?
>
> CHORLIAN: Only @Mike has access to the [Exchange-1] account on our team
>
> OSTERN: Ahh 10-4.
> Well, we ran out last night. So I just used the BTC to buy some more, and made you guys another 5 BTC with it
>
> CHORLIAN: 👍
> sadly mike isn't in the office so will be hard to get ahold of him. Will have to make sure we have a few of us with access going forward
> Do you have the [Exchange-1] deposit address?
>
> WOLVAARDT: That's alright, we can still work the price up so that when we do get a reload we'll have plenty of liquidity for better prices.
>
> CHORLIAN: I can send you tokens from the trezor

   b. On or about December 1, 2018:

> OSTERN: @Mike Need to reload the wallet.
> We have 112 BTC in the account as well.
> If you'd be willing, I think we could set the floor quite a bit higher if we push.
> (112 not including what's in buy orders now)

|  |  |
|---|---|
| KANE: | Yes you can use more BTC if you want let me arrange more hydro in the wallets now there is another 150 Mil pending in [Exchange-1], should clear in next hour or two |

28. For manipulating the price of HYDRO, **ANDREW CHORLIAN**, MICHAEL KANE, and SHANE HAMPTON caused Hydrogen Technology to pay GEORGE WOLVAARDT and TYLER OSTERN in Bitcoin in exchange for GEORGE WOLVAARDT and OSTERN's efforts to manipulate the price of HYDRO.

29. From in or around October 2018 through in or around December 2018, **ANDREW CHORLIAN** and his co-conspirators caused Hydrogen Technology to realize profits of approximately $1.3 million from the sale of HYDRO at artificially inflated prices.

### Overt Acts

In furtherance of the conspiracy and to accomplish its unlawful purpose and objects, at least one of the co-conspirators committed and caused to be committed, in the Southern District of Florida and elsewhere, at least one of the following overt acts, among others:

1. On or about October 30, 2018, **ANDREW CHORLIAN** and his co-conspirators caused the bot to place 44 Wash Trades via interstate wire communications through the trading account in the name of MICHAEL KANE where the account both bought and sold with itself and with no change in beneficial ownership approximately 189,817,141 HYDRO with an approximate value of $876,955.19.

2. On or about October 30, 2018, **ANDREW CHORLIAN** and his co-conspirators caused the bot to place a sell order via interstate wire communications for approximately 290,394 HYDRO, valued at approximately $1,341.62, which was filled by Trader A, who was a resident of the Southern District of Florida.

3.   On or about October 31, 2018, **ANDREW CHROLIAN** sent via interstate wire communications a resupply of approximately 50 million HYDRO to a crypto wallet used by Moonwalkers to trade on Exchange-1.

All in violation of Title 18, United States Code, Section 371.

By: *Markenzy Lapointe*
United States Attorney
Southern District of Florida

GLENN S. LEON
CHIEF, FRAUD SECTION

By: *Andrew Jaco*
Andrew Jaco
Trial Attorney
Fraud Section
U.S. Department of Justice

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: *Eric E. Morales*
Eric E. Morales
Assistant United States Attorney
Southern District of Florida

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO.: _____

v.

ANDREW CHORLIAN,
_____/

**CERTIFICATE OF TRIAL ATTORNEY**

**Superseding Case Information:**
New Defendant(s) (Yes or No) _____
Number of New Defendants _____
Total number of counts _____

**Court Division** (select one)
☒ Miami   ☐ Key West   ☐ FTP
☐ FTL   ☐ WPB

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.
2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.
3. Interpreter: (Yes or No) No
   List language and/or dialect: _____
4. This case will take __0__ days for the parties to try.
5. Please check appropriate category and type of offense listed below:

   (Check only one)          (Check only one)
   I    ☒ 0 to 5 days        ☐ Petty
   II   ☐ 6 to 10 days       ☐ Minor
   III  ☐ 11 to 20 days      ☐ Misdemeanor
   IV   ☐ 21 to 60 days      ☒ Felony
   V    ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) No
   If yes, Judge _____ Case No. _____
7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Magistrate Case No. _____
8. Does this case relate to a previously filed matter in this District Court? (Yes or No) Yes
   If yes, Judge Altonaga   Case No. 23-20165-CR
9. Defendant(s) in federal custody as of _____
10. Defendant(s) in state custody as of _____
11. Rule 20 from the _____ District of _____
12. Is this a potential death penalty case? (Yes or No) No
13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No
14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No
15. Did this matter involve the participation of or consultation with now Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No

By: _____
Eric E. Morales
Assistant United States Attorney
FL Bar No.   1010791

NITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name:** ANDREW CHORLIAN

**Case No:** _____

Count #:  1

Title 18, United States Code, Section 371

Conspiracy to commit wire fraud and securities fraud
* Max. Term of Imprisonment: 5 years
* Mandatory Min. Term of Imprisonment (if applicable): N/A
* Max. Supervised Release: 3 years
* Max. Fine: $250,000 fine or twice the gross gain or gross loss amount

*Refers only to possible term of incarceration, supervised release and fines. It does not include restitution, special assessments, parole terms, or forfeitures that may be applicable.

AO 455 (Rev. 01/09) Waiver of an Indictment

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No.   23-20171-CR-SEITZ/REID |
| | ) | |
| ANDREW CHORLIAN, | ) | |
| *Defendant* | ) | |

## WAIVER OF AN INDICTMENT

I understand that I have been accused of one or more offenses punishable by imprisonment for more than one year. I was advised in open court of my rights and the nature of the proposed charges against me.

After receiving this advice, I waive my right to prosecution by indictment and consent to prosecution by information.

Date: _____

_____
*Defendant's signature*

_____
*Signature of defendant's attorney*

_____
*Printed name of defendant's attorney*

_____
*Judge's signature*

_____
*Judge's printed name and title*